UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RHONDA L. FLEMING,                    )
                                      )
Plaintiff,                            )
                                      )
v.                                    )
                                      )    Case No. 4:15-CV-1150-SPM
                                      )
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security, )
                                      )
Defendant.                            )


**MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying

the application of Plaintiff Rhonda L. Fleming ("Plaintiff") for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.*

(the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge

pursuant to 28 U.S.C. § 636(c). (Doc. 8). Because I find the decision denying benefits complies

with the relevant legal requirements and is supported by substantial evidence, I will affirm the

Commissioner's denial of Plaintiff's application.

## I.    PROCEDURAL BACKGROUND

On June 19, 2012, Plaintiff applied for DIB and SSI, alleging that she had been unable to

work since January 28, 2011, due to glaucoma, emphysema, and depression. (Tr. 124-36, 154).

Her applications were initially denied. (Tr. 52-67). On March 5, 2013, after a hearing, the

Administrative Law Judge ("ALJ") issued an unfavorable decision on Plaintiff's claims. (Tr. 10-16). Plaintiff requested review by the Social Security Administration's Appeals Council, but on June 15, 2015, the Appeals Counsel denied the request for review. (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.  FACTUAL BACKGROUND[1]

### A.  Plaintiff's Testimony Before the ALJ

Plaintiff was 54 years old as of the date of the hearing before the ALJ. (Tr. 26). Her last job involved part-time work doing home health care, and she testified that she was laid off due to lack of work. However, she also testified that it was getting hard to work because the patients were mean and she could not deal with that with her depression. (Tr. 28). She testified to several physical problems that prevent her from working, including her emphysema making her out of breath; trouble standing some days; a need to sit down to catch her breath when doing anything physical; inability to walk more than half a block without sitting down; problems with her left wrist; and vision problems related to glaucoma. (Tr. 29-31, 49-51). She also testified that she has a hard time trying to concentrate; that she has depression that causes crying spells almost every day; that she has anxiety that makes her heart beat faster and her hands get shaky, which is when she has trouble trying to concentrate; that she has panic attacks a couple of times a month; and that she has bad days about ten times a month when she does not leave the house at all and does not do anything. (Tr. 41-47). On a typical day, she gets up, watches the news, makes her bed, and tries to clean; it takes her a day to clean a room. (Tr. 36). Aside from going to doctors and to the grocery store once a month, she rarely goes out. (Tr. 36, 45).

_____

[1] The following is not intended to be an exhaustive summary of the medical records. The Court focuses, as do the parties, on Plaintiff's mental impairments.

### B. Plaintiff's Medical Records

On February 14, 2011, Plaintiff saw her primary care physician, Dr. Sanjay Sharma, D.O., and reported symptoms of sweating, shaking, nausea, and blurred vision. She reported "significant anxiety." It was noted that she was already taking Prozac, and she was started on Ativan. (Tr. 225-27). Plaintiff reported that she exercised by walking and using weights and an exercise ball. (Tr. 235). She reported a general ability to do usual activities. (Tr. 236).

On March 22, 2011, Plaintiff returned to Dr. Sharma. She was in tears and reported living with a gentleman who she said was very manipulative and had a lot of control issues. She reported sweats coming in from nowhere and poor sleep. (Tr. 260). Her mood was sad, but her mental status examination was otherwise normal. Dr. Sharma diagnosed adjustment disorder with mixed anxiety and depressed mood, started her on Xanax, and referred her to a psychiatrist. (Tr. 261).

On April 11, 2011, Plaintiff returned to Dr. Sharma and reported that she had been feeling much better since she had been on Xanax. Dr. Sharma noted that Plaintiff still felt like seeing a psychiatrist because of ongoing issues, but "all in all she is doing much better." Also, he noted that "most of her issues revolve around her controlling partner." (Tr. 258).

On July 6, 2011, Dr. Sharma noted that Plaintiff "has been doing well and has no complaints." Dr. Sharma noted that Plaintiff "is doing better except when she is not on Xanax her anxiety is worse" and stated, "Most of her anxiety is associated with issues related to her fiancé." It was noted that she did exercise by walking and using weights and an exercise ball. (Tr. 256). Her mood was anxious but her mental status examination was otherwise normal. (Tr. 257).

On October 3, 2011, Plaintiff returned to Dr. Sharma for follow up, but no mental symptoms were discussed; her Xanax prescription was refilled. (Tr. 252-53).

On April 9, 2012, Plaintiff returned for follow-up and reported "going through some significant stress in life which is related to her family cabin that burned down," as well as issues with her boyfriend and finances. She reported anxiety. (Tr. 251). She was out of Xanax, and Dr. Sharma prescribed some. (Tr. 250-51).

On June 4, 2012, Plaintiff went to Dr. Sharma to have disability paperwork filled out. She reported not doing well with her depression. Dr. Sharma noted that she had stress with her boyfriend, as well as financial stress. Dr. Sharma noted that Plaintiff complained of anxiety, depression, crying spells, irritability, insomnia, depressed mood, lack of interest in pleasurable things every day for more than several months, fatigue, concentration issues, and irritability all the time. She was in tears and had a depressed mood, and Dr. Sharma diagnosed major depressive disorder, single episode, moderate. Dr. Sharma recommended a psychiatric consult. (Tr. 307).

On June 13, 2012, James W. Morgan, Ph.D., reviewed Plaintiff's records and found that Plaintiff had a medically determinable impairment of anxiety that resulted in no restriction in activities of daily living, mild difficulty in social functioning, mild difficulty in concentration, persistence or pace, and no episodes of decompensation. (Tr. 55-56, 63-64).

On August 9, 2012, Plaintiff saw Dr. C.J. Jos, M.D., for an initial psychiatric evaluation. Dr. Jos noted that Plaintiff reported a history of depression on and off for the last 20 years, consisting of depressed mood, crying spells, occasional suicidal thoughts, constant anxiety, and being nervous and anxious. (Tr. 293). He noted that Plaintiff had a "quite anxious" mood and affect and had "fair" concentration; her mental status examination was otherwise normal. (Tr.

293-94). He diagnosed generalized anxiety disorder, major depression (recurrent), and personality disorder with compulsive traits; he assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65;[2] he prescribed Xanax, Elavil, and Prozac; and he told Plaintiff to follow up in one month. (Tr. 294).

On September 7, 2012, Plaintiff reported to Dr. Jos that overall she was doing better and using her medications responsibly; Dr. Jos noted a fair mood and affect; assigned a GAF of 65; continued her medications; and advised Plaintiff to come back in three months and call if any issues came up before that. (Tr. 291-92).

On October 8, 2012, Plaintiff returned to Dr. Sharma and reported that she had seen a psychiatrist, that he continued her medications, and that she was feeling better. She reported being able to do usual activities, being in a good general state of health, and having no fatigue or weakness. She reported exercising using weights and walking. (Tr. 305).

On November 15, 2012, Plaintiff saw Dr. Jos and "reported she was having a lot of stress related to her boyfriend," but that the medications were helping her (Tr. 289). Her mood and affect were fair, and her GAF was 65. She was advised to come back in three months but to call before then if needed. (Tr. 288).

On February 7, 2013, Plaintiff returned to Dr. Jos, with her chief complaint being depression. Dr. Jos noted that Plaintiff "reported she was still under a lot of stress related to her

---

[2] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* 32.

boyfriend whom she thought was taking advantage of her" and that she "also felt her daughter was taking advantage of her." (Tr. 287). She was taking her medications responsibly and denied any side effects. Her mood and affect were depressed and she had "mild ideas of hopelessness and helplessness." She did not want a follow-up appointment with a counselor, but preferred to have a number to call in case there was a crisis. (Tr. 287). Her GAF score was 60.[3] (Tr. 287-88). She was again advised to return in three months but was told she could call sooner if needed. (Tr. 288).

On May 2, 2013, Plaintiff returned to Dr. Jos, again with a chief complaint of depression. (Tr. 285). She reported that her mother and boyfriend had had medical issues and that a young woman she knew had died of a heroin overdose. She reported using her medications responsibly and denied side effects. Her mood and affect were fair. Her GAF score was 60. Dr. Jos diagnosed major depression, recurrent, and generalized anxiety disorder. (Tr. 285). Dr. Jos also noted that Plaintiff was waiting for a disability hearing and stated, "In my opinion, this patient will have a significant difficulty holding a job for an extended period of time because of depression, anxiety, and ongoing physical problems." (Tr. 286).

On July 24, 2013, Plaintiff returned to Dr. Jos with complaints of depression and anxiety. She reported personal conflicts with her husband. Her mood and affect were fair, and her GAF was 60. (Tr. 283).

On October 21, 2013, Plaintiff saw Dr. Jos and reported that anxiety still continued to be a problem. Her mood and affect were anxious. Plaintiff reported difficulty holding jobs because of difficulty with concentration, lack of focusing, high anxiety and fear of failing, and a feeling

---

[3] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

of being overwhelmed. She reported that the Xanax was helping to some extent but she still had difficulty. (Tr. 296). Dr. Jos noted, "In my opinion, this patient with the continued anxiety and concentration problems would have significant difficulty holding a job for an extended period of time." (Tr. 297).

### III.   STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At

Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); McCoy, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since January 28, 2011, the alleged onset date; that Plaintiff had the severe impairments of chronic obstructive pulmonary disease, an arthritic left wrist, major depression, and a generalized anxiety disorder; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 12). The ALJ found, "[Plaintiff] has had the residual functional capacity to perform light work as that term is defined in 20 CFR 404.1567(a) and 416.967(a), except that she has been unable to reach, push, pull, finger or handle with her non-dominant left upper extremity more than frequently (she has not had any limitation with her dominant upper extremity) and she has had to avoid concentrated exposure to humidity, dust, odors, fumes and other pulmonary irritants. She has also been able to understand, remember and carry out simple, repetitive tasks, but she has only been able to have occasional interaction with supervisors, co-workers and the public and the work must be performed in a low-stress environment ("low stress" being defined as requiring only occasional decision-making and involving only occasional changes in the work setting)." (Tr. 13). The ALJ found that Plaintiff was unable to perform her past relevant work. (Tr. 15). However, relying on interrogatory responses from a vocational expert, the ALJ found that there were a significant

number of jobs in the national economy that Plaintiff could do, including photocopy machine operator, *Dictionary of Occupational Titles* (*DOT*) No. 207.685-014, production line solderer, *DOT* No. 813.684-022, and mail clerk, *DOT* 209.687-026. Thus, the ALJ found Plaintiff not disabled within the meaning of the Act. (Tr. 17).

## V. DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds: (1) that the RFC is not supported by substantial evidence because it does not account for Plaintiff's most significant symptom—a concentration impairment; and (2) that the ALJ's finding at Step Five was not supported by substantial evidence.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent

positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B. The RFC Is Supported by Substantial Evidence

Plaintiff first contends that the RFC is not supported by substantial evidence because it does not account for Plaintiff's concentration impairment. A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ did include some mental impairments in the RFC, limiting Plaintiff to an ability to "understand, remember and carry out simple, repetitive tasks"; to only "occasional interaction with supervisors, co-workers and the public," and to work "performed in a low-stress environment ('low stress' being defined as requiring only occasional decision-making and involving only occasional changes in the work setting)." (Tr. 13). However, Plaintiff argues that the RFC is not supported by substantial evidence because it does not include a specific concentration deficit. For the following reasons, the Court finds that the RFC was supported by substantial evidence despite the absence of a specific concentration deficit.

First, a review of the record shows that despite Plaintiff's assertion in her brief that a concentration impairment was her "most significant symptom," Plaintiff's treatment records rarely contain any indication of concentration issues. Although Plaintiff submitted records

reflecting nearly three years of regular medical treatment, those notes appear to contain only three brief mentions of concentration: (1) a June 2012 note (fifteen months into the alleged disability period) indicating that when Plaintiff went to Dr. Sharma for completion of disability paperwork, the description of Plaintiff's numerous complaints included "concentration issues" (Tr. 307); (2) an August 2012 mental status examination finding by Dr. Jos that Plaintiff had "fair" concentration (Tr. 294); and (3) an October 2013 note from Dr. Jos indicating that Plaintiff had a disability hearing coming up; that Plaintiff "indicated difficulty holding jobs because of her difficulty with concentration, lack of focusing, high anxiety and fear of failing, a feeling of being overwhelmed;" and that in Dr. Jos's opinion, "this patient with the continued anxiety and concentration problems would have significant difficulty holding a job for an extended period of time." (Tr. 296-97). During the first fifteen months of the alleged disability period (January 2011 through May 2012), there were no mentions of concentration issues. In addition, although Plaintiff received regular treatment from Dr. Jos, there were no mentions of concentration in the fifteen months of treatment notes between Dr. Jos's single finding of "fair" concentration in June 2012 and his notation of concentration difficulties as a symptom in October 2013. The infrequent mentions of concentration deficits in the record support the ALJ's decision not to include concentration deficits in the RFC.

Second, an examination of the record suggests that the RFC's limitations on interpersonal interaction and stress will tend to address Plaintiff's alleged concentration impairment. Plaintiff testified that it is during periods of anxiety that she has trouble concentrating. (Tr. 44). The record indicates that Plaintiff's reports of anxiety and depression were most often connected to interpersonal stressors such as problems with her partner and mother or other stressors such as financial issues. (Tr. 250, 256, 258, 260-61, 283, 285, 287, 289, 307). The limitations in the RFC

to only occasional interaction with others and to work performed in a low-stress environment account for any concentration impairment that would accompany such stressors.

Third, as the ALJ noted, the medical records indicate that Plaintiff's conditions improved significantly with treatment. Plaintiff's medications significantly improved her anxiety, sometimes to the point where she was doing well and had no complaints. (Tr. 256, 258, 289, 291-92, 305). To the extent that Plaintiff's condition was controlled by medication, it cannot be considered disabling. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (quoting *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir. 1995)).

Fourth, as the ALJ noted, the record generally contains largely normal to mild or moderate findings with regard to Plaintiff's mental state. Dr. Sharma specifically noted on several occasions that Plaintiff's "attention" was good. (Tr. 257, 259, 307). Aside from some findings of an anxious or depressed mood and the one finding of "fair" concentration mentioned above, Plaintiff's mental status examinations during the disability period were generally unremarkable. Moreover, the GAF scores Dr. Jos assigned suggested only mild or moderate symptoms. (Tr. 285, 287-88, 291-92, 294). These findings support the ALJ's decision not to include mental limitations in the RFC beyond those she included.

Fifth, the state agency psychologist who reviewed Plaintiff's medical records in June 2012 found that Plaintiff's anxiety resulted in only mild difficulty in concentration, persistence or pace, and the ALJ considered that opinion. (Tr. 14, 55-56, 63-64). Although the opinion of a non-examining source does not, standing alone, constitute substantial evidence, it is not improper for the ALJ to consider such opinions along with the medical record as a whole. *See Casey v.*

*Astrue*, 503 F.3d 687, 694-95 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the state agency medical consultant] along with the medical evidence as a whole.").

Sixth, the ALJ properly evaluated the credibility of Plaintiff's subjective complaints and found that they lacked credibility. (Tr. 15). When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of [the alleged symptoms]; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore*, 572 F.3d at 524 (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). The ALJ discussed several of these factors, including the medical findings in the record that were largely unremarkable, mild, or moderate; the frequency with which Plaintiff denied psychiatric symptoms; the effectiveness of her anti-anxiety medications; her minimal work history in the ten years preceding the disability period; and the inconsistencies between her allegations of limited daily activities and her reports to Dr. Sharma that she could perform her usual activities because she was in a generally good state of health and did not feel fatigued or weak. (Tr. 14-15).

Plaintiff suggests that the ALJ's credibility analysis was inadequate because the ALJ did not *specifically* address and discount the credibility of Plaintiff's complaints of impaired concentration. However, Plaintiff points to no regulation or case law requiring the ALJ to perform a separate credibility analysis for each specific symptom alleged. Indeed, "an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). As discussed above, the ALJ properly analyzed the credibility of Plaintiff's complaints of mental impairments using

the required factors and gave good reasons for discounting Plaintiff's complaints, and the Court must defer to the ALJ's analysis. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (the court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'") (quoting *Wildman*, 596 F.3d at 968).

In light of the few mentions of concentration deficits in the medical record, the evidence that Plaintiff's medications were generally effective in treating her mental impairments, the frequently mild or unremarkable mental status examination findings in the record, the opinion of the state agency physician, and the ALJ's analysis of the credibility of Plaintiff's subjective complaints, the Court finds that substantial evidence in the record as a whole supports the ALJ's decision to make an RFC finding that did not include a concentration deficit.

Plaintiff's other specific arguments do not alter the court's conclusion. Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ did not adequately evaluate Dr. Jos's statement from October 2013, in which Dr. Jos mentions concentration problems. (Tr. 297). However, that argument is without merit, because the October 21, 2013 opinion statement was essentially a restatement of his May 2, 2013 opinion statement, which the ALJ did specifically address. (Tr. 14-15, 286). On May 2, 2013, Dr. Jos stated, "In my opinion, this patient will have a significant difficulty holding a job for an extended period of time because of depression, anxiety, and ongoing physical problems." (Tr. 286). The ALJ gave this opinion little weight, finding that it was inconsistent with the mental status evaluation results Dr. Jos obtained; was inconsistent with the Dr. Jos's assessments of Plaintiff's functioning in the generally mild to moderate GAF scores Dr. Jos assigned; and was inconsistent with the record as a whole (as discussed above). (Tr. 14-15). These were appropriate reasons to discount the opinion. *See, e.g., Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for

an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). The Court further notes that Dr. Jos did not specify that Plaintiff had any particular functional limitations; instead, he merely opined that she would have "significant difficulty holding a job" due to her impairments, which is not the sort of opinion that is entitled to controlling weight. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."). In his second statement on October 21, 2013, Dr. Jos noted, "In my opinion, this patient with the continued anxiety and concentration problems would have significant difficulty holding a job for an extended period of time." (Tr. 297). The ALJ's explanation for giving little weight to the first opinion statement is plainly equally applicable to this second, very similar opinion statement, even if the second statement contained a brief mention of concentration problems. As discussed above, significant concentration problems are not supported by Dr. Jos's own treatment notes or the record as a whole. The Court further notes that it is apparent from the ALJ's decision that she did consider the October 2013 statement, because she specifically identified records through October 2013 in her decision. (Tr. 14).

Plaintiff also argues that the ALJ should have included a concentration deficit in the RFC (and in the hypothetical question posed to the vocational expert) because at Step Three, the ALJ found Plaintiff to have moderate deficits in concentration. Plaintiff cites *Newton v. Chater*, 92 F.3d 688, 694-95 (8th Cir. 1996), in which the court held that where the ALJ had found earlier in the five-step process that the plaintiff "often" had difficulties with concentration, persistence, or pace, the RFC and hypothetical question posed to the vocational expert should have included a limitation on concentration. However, *Newton* is distinguishable. First, here, unlike *Newton*, the

ALJ found at Step Three that Plaintiff had "*no more than* moderate difficulties maintaining concentration, persistence and pace"; she did not make a specific finding that Plaintiff had any particular level of deficit in concentration, persistence, or pace. It appears from the record that the ALJ was merely giving Plaintiff every possible benefit of the doubt at Step Three. Second, in *Newton*, the Court noted that there was no dispute in the medical evidence that the plaintiff had significant concentration and attention problems, emphasizing that two doctors and the ALJ had made findings regarding Plaintiff's ability to maintain attention and concentration. *See id.* at 695. Here, as discussed above, the record contains minimal evidence of concentration deficits. Third, in contrast to *Newton*, in which the ALJ limited the plaintiff only to "simple tasks," here the ALJ included several other limitations that addressed Plaintiff's alleged concentration deficit, limiting Plaintiff to "simple, repetitive tasks"; to only "occasional interaction with supervisors, co-workers and the public," and to work "which does not require close attention to detail." These limitations limit Plaintiff's exposure to stressful situations and to potential distractions, and on the present record they are sufficient to account for any limitation in concentration, persistence, or pace. *Cf. Brachtel v. Apfel*, 132 F.3d 417, 412 (8th Cir. 1997) (holding that a hypothetical including limitations to "simple routine repetitive work, which does not require close attention to detail" and to not working at "more than a regular pace," although "scantly more than what was included in the *Newton* hypothetical," was sufficient to account for deficiencies in concentration).

### C. The ALJ's Step Five Analysis Is Supported by Substantial Evidence

Plaintiff's next argument is that the ALJ's finding at Step Five that Plaintiff could adjust to work other than her past work was not supported by substantial evidence. As discussed above, the ALJ relied on interrogatory responses from a vocational expert at Step Five to find there were

a significant number of jobs in the national economy that Plaintiff could do, including photocopy machine operator, *Dictionary of Occupational Titles* (*DOT*) No. 207.685-014 (300 jobs in Missouri and 11,000 in the United States), production line solderer, *DOT* No. 813.684-022 (300 jobs in Missouri and 10,500 in the United States), and mailroom clerk, *DOT* 209.687-026 (150 jobs in Missouri and 10,000 in the United States). (Tr. 16, 216).

Plaintiff first argues that the ALJ's Step Five finding is not supported by substantial evidence because the vocational expert indicated that she did not have sufficient evidence to reach a reliable conclusion. The form submitted to the vocational expert contained several questions with check boxes next to them, one being, "Is there sufficient evidence to allow you to form an opinion of the claimant's vocational status? (If no, omit the remaining questions and identify what additional evidence you believe is required)." (Tr. 214). The vocational expert placed a check next to "No" on the form. (Tr. 214). However, she proceeded to answer the remaining questions on the form and identified specific jobs that the hypothetical claimant could perform. (Tr. 215-17). In light of the fact that the vocational expert offered several specific opinions regarding Plaintiff's vocational abilities, the only reasonable reading of the record is that the vocational expert *did* find that she had sufficient evidence to form an opinion of Plaintiff's vocational status, and her checking of the "No" box was a simple mistake. The Court does not find that this mistake requires remand.

Plaintiff also suggests that the vocational expert's findings lacked a reliable basis because it is unclear whether the ALJ provided the vocational expert with all of the relevant exhibits. Plaintiff appears to rely on the fact that because the ALJ's letter to the vocational expert referenced "selected" exhibits, some exhibits were excluded. However, the ALJ's letter to the vocational expert stated, "Enclosed is a Compact Disc (CD) with exhibits selected for inclusion

in the record in this case." (Tr. 208). This suggests that the ALJ simply sent the exhibits that were part of the record in this case, not that the ALJ selected only certain exhibits to send to the vocational expert. Moreover, even if the ALJ did not send every single exhibit in the record to the vocational expert, Plaintiff offers no authority requiring the ALJ to do so. In addition, as the ALJ's letter to Plaintiff's attorney makes clear, Plaintiff had the opportunity to submit additional evidence to the vocational expert, submit legal argument, question the expert, or provide written questions to the expert. (Tr. 219). She apparently chose not to avail herself of that opportunity.

Plaintiff next suggests that the ALJ's Step Four findings, which differ from the vocational expert's findings at Step Four, undermine the reliability of the vocational expert's evidence at Step Five. As Plaintiff points out, although the vocational expert described Plaintiff's past work as "production assembler," "home health aide," and "housekeeper," the ALJ described Plaintiff's past work as "warehouse manager." (Tr. 15, 214). Plaintiff speculates that the ALJ's rejection of the vocational expert's Step Four findings shows that the ALJ lacked confidence in the vocational expert's testimony generally.[4] However, that speculation is directly at odds with the ALJ's decision, in which the ALJ relied on the vocational expert's evidence at Step Five, making a specific finding that "This evidence is credible." (Tr. 16).

Finally, Plaintiff argues that the ALJ's finding at Step Five was defective because there is an unresolved conflict between the description of the job requirements in the *DOT* and the vocational expert's testimony that a person with Plaintiff's RFC could perform those jobs. As Plaintiff correctly points out, "If there is an 'apparent unresolved conflict' between VE testimony

---

[4] To the extent that Plaintiff is alleging that the discrepancy between the ALJ's Step Four findings and the vocational expert's Step Four findings is an independent error that requires remand, such an argument is without merit. Even assuming that the ALJ made some error in describing Plaintiff's past work at Step Four, that error was harmless, because the ALJ ultimately found at Step Four that Plaintiff could *not* perform her past work and thus proceeded to Step Five of the analysis.

and the *DOT*, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information.'" *Moore v. Colvin*, 769 F.3d 987, 989-990 (8th Cir. 2014) (quoting Social Security Ruling 00-4p, 2000 WL 1898704, at *2-4 (Dec. 4, 2000)). *See also Kemp v. Colvin,* 743 F.3d 630, 633 (8th Cir. 2014) (remanding case where "the record does not reflect whether the [vocational expert] or the ALJ even recognized the possible conflict between the hypothetical" and the requirements of the job identified).

Plaintiff's principal argument appears to be that there is a conflict between the RFC's limitation to an ability to "understand, remember and carry out simple, repetitive tasks" and the requirement of a *DOT* reasoning level of 2 or 3 in the jobs identified by the Vocational Expert.[5] Two of the three jobs identified by the vocational expert (photocopying machine operator and production line solderer) require a *DOT* reasoning level of 2, which requires a person to "[a]pply commonsense understanding, to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving few concrete variables in or from standardized situations." *See DOT* No. 207.685-014 (photocopying-machine operator), 1991 WL 671745; *DOT* No. 813.684-022 (solderer, production line), 1991 WL 681592. The third job (mailroom clerk) requires a reasoning level of 3, which requires a person to "apply common sense understanding,

---

[5] To the extent that Plaintiff is arguing that some other conflict exists between the vocational expert's testimony and the *DOT*, Plaintiff has failed to identify such a conflict, and such a conflict is not apparent to the Court. To the extent that Plaintiff is suggesting that remand is required because the RFC contains some limitations not described in the RFC, Plaintiff cites no cases in support of that assertion, and the Court does not find it to be a basis for remand. *See Stamper v. Colvin*, No. 4:14-CV-2101-JAR, --- F.Supp.3d ----, 2016 WL 1246045, at *6 (E.D. Mo. March 30, 2016) (noting that "[t]he *DOT*'s silence on a given limitation does not normally create a conflict between a vocational expert's testimony and the DOT"); *McCallister v. Astrue*, No. 4:11-CV-792 CAS, 2012 WL 4357878, at *9 (E.D. Mo. Sept. 24, 2012) (finding no conflict between the *DOT* and the vocational expert's testimony where the *DOT* was silent as to a particular limitation).

to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." *See DOT* No. 209.687-026 ("mail clerk"), 1991 WL 671813.

The Court first considers whether there is a conflict between the limitation in the RFC (and in the question posed to the vocational expert) to the ability to "understand, remember and carry out simple, repetitive tasks" and the ability to perform jobs with a *DOT* reasoning level of 2. The Eighth Circuit has addressed almost precisely this question and found no conflict. In *Moore v. Astrue*, the hypothetical posed to the vocational expert described an individual who was capable of "carrying out simple job instructions" and performing "simple, routine and repetitive work activity at the unskilled task level." 623 F.3d 599, 602-03 (8th Cir. 2010). The vocational expert identified jobs requiring a *DOT* reasoning level of 2, defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." *Id.* at 604. The plaintiff alleged that there was a conflict because the limitations in the hypothetical could only be satisfied by occupations requiring a reasoning level of 1, defined in the *DOT* as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." *Id.* The Eighth Circuit disagreed, stating:

> The ALJ did not err in relying on the vocational expert's testimony. In the hypothetical, the ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a *DOT* Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. *DOT* at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

Moreover, the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category. "[A] claimant's reliance on the *DOT* as a definitive authority on job requirements is misplaced because *DOT* definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Page [v. Astrue]*, 484 F.3d [1040,] 1045 (internal quotation marks omitted). "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." *Wheeler v. Apfel,* 224 F.3d 891, 897 (8th Cir. 2000); *see DOT* at xiii. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." *Wheeler,* 224 F.3d at 897. There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. *See Whitehouse v. Sullivan,* 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the *DOT,* the ALJ properly relied on the testimony. *See Page,* 484 F.3d at 1045.

*Moore v. Astrue*, 623 F.3d 599, 604-05 (8th Cir. 2010).

*Moore* is on point. The restriction in the RFC in this case to the ability to "understand, remember and carry out simple, repetitive tasks" is nearly identical to the restriction in *Moore* to "carrying out simple job instructions" and performing "simple, routine and repetitive work activity." As in *Moore*, the ALJ here did not limit Plaintiff to simple "one- or two-step instructions" and did not otherwise indicate that Plaintiff could perform only at *DOT* reasoning level 1. Moreover, as in *Moore*, there is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. Additionally, the vocational expert expressly indicated that there were no conflicts between the evidence she provided and the occupational information in the *DOT*. (Tr. 217). Thus, with regard to the jobs of photocopy machine and production line solderer, the Court finds no conflict between the vocational expert's evidence and the DOT.

In light of the Court's finding that there was no *DOT* conflict with regard to the jobs of photocopy machine operator and production line solderer, the Court need not reach the question of whether there was a conflict regarding the job of mail clerk, which requires a reasoning level of 3. The vocational expert testified that there were 300 photocopy machine operator jobs in Missouri and 300 production line solderer jobs in Missouri. Even if the Court assumes, *arguendo*, that there was a conflict with regard to the vocational expert's testimony about the additional 150 mail clerk jobs in Missouri, any such error was harmless, because the Court is satisfied that the number of other jobs identified (600 in Missouri) constitutes a significant number of jobs available to Plaintiff. *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (affirming the trial judge's finding that 200 jobs in Iowa constitutes a significant number); *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997) (affirming the trial judge's finding that 30,000 jobs in the national economy and 650 jobs in the state constitute a significant number); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs in region considered significant).

For all of the above reasons, the Court finds that the ALJ's Step Five determination is supported by substantial evidence.

## VI.   CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of August, 2016.